Good morning, your honors. Good morning. Opposing counsel, and may it please the court, Chad Pennington, assistant federal public defender on behalf of the appellant in this matter, Mr. Harold Bolman. Your honors, this is a case about a tragic but ultimately accidental death of Mr. Billy White Eagle and how that accident has only been compounded by Mr. Bolman receiving the wrong legal outcome. In 2018, Mr. Bolman was convicted by a jury of involuntary manslaughter. However, at that trial, neither was there sufficient evidence presented, nor was the jury properly instructed in order to sustain that conviction. To affirm Mr. Bolman's conviction here would substantially diminish this court's longstanding involuntary manslaughter standard, nearly 40 years in the making, and risk the loss of an essential element to that offense. We respectfully request that this court reverse in favor of a judgment of acquittal or alternatively remand for further proceedings. Mr. Bolman raises two issues here on appeal. The first is that the United States did not present sufficient evidence on the mens rea requirement of gross negligence in order to sustain that conviction. In this district, there are two elements to gross negligence. There are two factors to gross negligence, I should say, wanton or reckless disregard for human life. In this particular district, as this court has applied the jurors' prudence on involuntary manslaughter, what we don't have in this case is consistency with those cases, your honors. When we look at Schmidt, when we look at Obsta, we look at McMillan, we have something more in addition to intoxication. In this case, the United States proceeded as if this was a strict liability offense. Involuntary manslaughter is not a strict liability offense. It requires a certain amount of mens rea, specifically being gross negligence. Here in this particular case, from the outset, even looking at the conduct of the agents on the scene, whether it be Sheriff Frank Landis, whether it be Officer Raymond Webb, whether it be Officer Rousseau, they treated this offense as if it was strict liability. Officer Landis specifically stated that he didn't conduct a forensic examination of the scene specifically because Mr. Bolman had confessed to being intoxicated while driving. Officer Rousseau similarly said that although he had the basic accoutrements to perform a site reconstruction, he didn't do so, again, because Mr. Bolman had confessed to driving while intoxicated. Same thing can be said of Officer Webb. He arrives on the scene. He sees Mr. Bolman sitting by the house of 311 Rosser. He appears to be intoxicated. No additional site investigation was conducted. What we don't have here that we had in those previous cases, for example, McMillan, Schmidt, we don't have anything additional beyond the actual fact that Mr. Bolman was putatively intoxicated. Now, we did have blood alcohol tests administered. I believe Mr. Bolman's BAC at that point was either .202 or .205. It's different in the record. However, what we don't have is anything beyond that. What about the testimony or the evidence that not only was the blood alcohol that high, he couldn't speak clearly, he had actually said that he couldn't go in, was that he couldn't go into a store, he was so drunk, and really he shouldn't have been behind the car. Are those factors over and above just the straightforward, what you're calling strict liability, drunk driving? Your Honor, I think that those factors, they contribute to the analysis, but what we have here is conflicting testimony with respect to what Mr. Bolman's condition was. We do have evidence that there was possibly urine on his pants, that he had trouble standing. He also was able to stand unassisted, walk to the squad car. He had his hands cuffed. He had no trouble making that particular walk. He asked the officer, I believe it was Officer Webb, to uncuff him because they were hurting his hands. So what we have, Your Honor, is that he was able to conduct himself in a particular way. Would that be a question then for the jury, though, to decide whether or not they believed that he was unable to talk, unable to stand very well, or whether he was more able to control his physical movements? Isn't that something for the jury to decide? Your Honor, those are jury decisions, absolutely, but what we don't have here is given the fact that we don't have a reconstruction, we don't have a sufficient amount of evidence to justify the conviction. We have evidence that he might have been intoxicated, but we also have evidence that he didn't want to drive and that he was aware he didn't want to drive. He wasn't driving in Bismarck. That was Mr. Pettit. And when he actually goes out to sleep, Your Honor, he says, I'm going to go to sleep. How does that help him? How does that help him if he knew that he shouldn't drive and knew he didn't want to drive, but then did end up driving? Your Honor, that goes to whether his conduct was wanton or reckless. If he knows he shouldn't drive and he's just simply backing the car up to go to sleep, to in essence sleep off the drunkenness, that demonstrates that his conduct wasn't wanton or reckless. I don't understand. Explain that further. I mean, if he knows he shouldn't drive and he backs up the car, then he is driving the car. Your Honor, it goes to his intent about what he wanted to do when he was driving. Unlike McMillan, he's not planning on driving through the city. He's not planning on making a distance. All he literally wants to do is back the car up 10 to 15 feet to sleep it off. This is not someone that wants to drive knowing that he's intoxicated, knowing that that may pose a risk to human life. What he's trying to do is basically abate the drunkenness, back the car up, recline the car and take a nap. What he's not trying to do, Your Honor. I would say once he starts to move the car though, whether it's driving across town or driving backwards in an area that's known to have pedestrian traffic, it's the same thing as a legal matter. Your Honor, I think, I'm sorry, Your Honor. What about that? Your Honor, I think it would go to whether the conduct was wanton or reckless. And that's why this particular case here is so deficient, is because we don't have anything beyond him being intoxicated and firing the ignition. That's all we have. But if you look at this court's jurisprudence on involuntary manslaughter, there's always been something more than simply firing the car up and driving. Driving in a high trafficked area, speeding, in the case of McMillan, there actually was a site reconstruction done and they determined that he was driving 70 miles per hour in what was ultimately, I think, a residential area. He blew a stop sign, he crashed. We don't have any of that. All we have is that he was tired, he fires the car up, planning just to back up and go to sleep. That's where the site reconstruction would have been so helpful. And Your Honor, there's also additional, it's important to note that the United States probably could have brought this case under a different offense. If they're treating it as if it's strict liability, through the Assimilative Crimes Act, there are other offenses by which this could have been brought, namely the North Dakota vehicular homicide statute. That is a classic strict liability offense. There would be a question of assimilation, of course. Couldn't say here today that he'd be convicted of that offense, but that was available to the United States and had they wanted to proceed under a strict liability theory, that was available to them. As you see how the North Dakota Supreme Court has interpreted that particular statute, it's essentially you're intoxicated or over the legal threshold, you drive, there's either an injury or death, that's liability right there. Involuntary manslaughter requires something different. It's not a strict liability offense. It has this additional mens rea requirement that adds something more to the offense that wasn't met here, and it was impossible to meet here because we just simply, Your Honors, don't know what happened. We know that there was a death, but we have no idea how that accident was, how it took place. I believe it was the forensic pathologist, Dr. William Massell, that testified, Mr. Whiteheel could have been asleep. He could have been underneath the in the government's brief regarding a camera, but we don't know if the camera worked. We have some testimony that Mr. Bowman didn't like to use it, but without an actual reconstruction, without an evaluation of the vehicle, we simply don't know what state that back-up camera was in. We don't know if the back-up camera would have worked and actually saw Mr. Whiteheel sitting there. What would the reconstruction have done? I understand you're arguing about assessing the ability of the whether the truck's camera is working and that sort of thing, but what would the reconstruction, how would that help the government's case in where you're saying it's lacking? Your Honor, where it would be beneficial to the government is it could tie the conduct into the something more besides intoxication that has been true throughout this circuit's history with regards to the specific offense charged, a voluntary manslaughter. For example, what might have popped up? Your Honor, for example, we could have determined how fast Mr. Bowman was driving when he backed the car up. We could have determined if he actually even put the car in reverse or just put it in neutral. We don't even know at this point which gear the vehicle was in. We could have had perhaps a reconstruction of where Mr. Whiteheel was. We could have had a further investigation as to what Mr. Whiteheel was doing. We know Mr. Whiteheel was intoxicated and there's evidence or testimony that he went to use the restroom, but we really don't know where he was, really don't know what he was doing. We don't know what he actually doing in terms of its relationship to the pickup truck. So there was no testimony about what Mr. Whiteheel was doing shortly before this accident, this incident? Your Honor, we have limited testimony just that he was planning on using the restroom and that was coming from Officer Frank Landis. We have the testimony that Mr. Whiteheel himself was highly intoxicated. At the beginning of the trial, it was estimated that his BAC was around 0.3, 0.4. So he's highly intoxicated too and when the forensic pathologist says it's possible that he's on the ground, he could have fallen asleep, that's something that a reconstruction would have been highly beneficial to because we simply don't know at the point in which Mr. Bowman ran him over, the speed, the velocity, the angle. We don't know any of those things at this point. Specifically, what element was not satisfied? The lack of evidence of gross negligence? Was that what was lacking here? You're talking about men's rail. Specifically, what element of proof was missing? Your Honor, with regards to sufficiency, it is the gross negligence element that's lacking here. Because there's no evidence of speeding or reckless driving, what have you, going the street or that? Otherwise, it's not possible to be guilty of gross negligence by backing over someone who's under the car. Your Honor, it could be possible of gross negligence backing someone up over the car or backing up, but what we don't have here is how the actual backing up took place. We don't know how the accident occurred. We don't have evidence that, for example, the wheels were squealing or he was moving fast or there was a loud collision. If all of that is necessary, could you get guilty of gross negligence by backing over someone who's in an immobile position, whether it was two miles an hour or 20? You could be, Your Honor, but based on the facts here, we don't know exactly how the accident happened. Other than what he said, which was what? What did he admit to? Mr. Bowman himself admitted to being intoxicated and he additionally admitted to backing over Mr. White Eagle. What we don't have is where Mr. White Eagle was, how fast the vehicle was going, if Mr. White Eagle was standing, if Mr. White Eagle was lying on the ground, if the rear camera could have possibly viewed Mr. White Eagle. We don't have that additional evidence that could raise this case beyond strict liability into the zone or ambit of involuntary manslaughter. As to the second issue Mr. Bowman brings on appeal, it's whether the jury was properly instructed as to an essential element, actual knowledge. In this court's jurisprudence on involuntary manslaughter, beginning with Schmidt, applied all the way through McMillan, Kilray, et cetera, abstra, actual knowledge has been an essential element and that's clear in the holding in Schmidt. The government cites to a portion of Schmidt that comes from a line of cases that preceded the application of the actual knowledge standard in this circuit. Why isn't this covered in the gross negligence definition? Your Honor, because the holdings in this particular circuit have been clear that actual knowledge is a separate and distinct element. And you look at how gross negligence functions and the requirements of want and a reckless disregard for human life, that's different than how the actual knowledge standard works, which is an actual knowledge of a threat or actual knowledge of the circumstances by which one could foresee the peril their conduct subjects others to. But that language is in the gross negligence definition. So in order to find that Mr. Bowman acted beyond a reasonable doubt with gross negligence, they had to find that it was either knowing that the conduct was a threat or with knowledge that he could foresee the conduct might be a threat, wouldn't they? Your Honor, the way that the jury was instructed in this particular case, the gross negligence standard without the and, without being separated, it collapsed on the actual knowledge standard. So the jury was instructed as to a definition of actual knowledge, but the jury in no way knew that actual knowledge in and of itself was an essential element independent of gross negligence. What do you mean by independent? Why does it have to be independent as long as they had to find the element? Your Honor, because he had to find that he acted with wanton and reckless disregard, number one, and number two, that he had to have done so either with knowledge or the two types of knowledge. Why isn't that enough? It's insufficient here because, one, the case law is that actual knowledge is an independent element. Secondly, the actual conduct, the standard, is different. It's similar, but it's different. Acting with wanton or reckless disregard is different than understanding of the threat to human life, and that's why there's been a distinction between the two as applied in this circuit. I don't understand. What difference does it make whether the elements are listed in one instruction or two different instructions as long as the jury's told they have to find them? The difference, Your Honor, would be that the jury wasn't aware that they had to find both beyond a reasonable doubt. When actual knowledge is a separate and distinct essential element, and that's subsumed by gross negligence, the jury is unaware of what the government's burden is as respect to all the various elements. Your Honor, as I see my time is up, and I'll reserve the remainder for rebuttal. Thank you. I don't think you have any time left for rebuttal. I think you've used it all. Oh. Okay. Very well. Thank you for your argument. Mr. DeLorme, we'll hear from you. Good morning, Your Honors. May it please the Court, Counsel. My name is Gary DeLorme. I'm not the trial attorney for this particular matter. Who was the trial attorney? It was Brandy Russell with our office, Your Honor. I happen to have another argument before this panel later this morning, so it would be obvious for me to take it because she was on vacation. I see. In this particular case, Your Honor, I know the defense wants to basically look beyond – they don't want you to look beyond just the DUI that took place. The DUI took place when Mr. Bowman entered the vehicle, started the vehicle, put it in gear, and moved. He wants you to disregard everything that happened prior to that. And what we know what happened prior to that is, well, Mr. Bowman woke up that morning. He started drinking early. He admittedly indicated to the agent that he started drinking beer and wine earlier in the day, was drinking throughout the day. He knew at some point he was too intoxicated to drive, and he arranged for another individual to drive him to Bismarck for the sole purpose of stopping at a store and shopping for clothing. Once he got to Bismarck, he couldn't even leave the vehicle because of his intoxication to actually shop for the clothes that he wanted to travel to Bismarck for. He returned back to the Solon area, continued to drink throughout the day, and then at some point, he gets in his vehicle, starts it up, puts it into gear, and backs up, driving over the victim in this particular matter. He knew or should have known that he had to look for the roadway and make sure that it was clear. He had a backup camera on the vehicle. No, there was no testimony or indication that the backup camera was used. However, Mr. Bowman was asked during his interview about the backup camera or the safety feature on his vehicle, and he said he never got used to that thing, so he just didn't use it. He got in the vehicle. He drove over this individual. When the law enforcement arrived, I think it was 10 to 15 minutes after the individual was run over, Mr. Bowman couldn't walk without assistance. The officer had to assist him to the vehicle. He was slurred speech. He was extremely intoxicated. I think the testimony, and I think it was the PAC, is what I recall from reading the documents in this particular matter. So there's a whole lot more there that the jury was looking at in this particular matter when they're making that assessment later on whether or not Mr. Bowman acted in gross negligence in committing this particular crime. As to the instructions themselves, one of the things I'm having a hard time understanding myself is the argument by defense for Mr. Bowman at this point that the court erred, plainly erred, in not providing essentially the model instructions when there was no objection. The instructions that were provided by the district court almost tracked identically with what Mr. Bowman offered to the court prior to the closing arguments of the trial. The only addition that the court included was specifically referencing the DUI in reference to the actions of Mr. Bowman in the case of unlawful act not amounting to a felony. That was really the only addition. The court provided the instructions that was indicated to the parties. The court also provided the definition of gross negligence that this court adopted and defined in U.S. v. Schmidt. It seems, maybe it's the case law and maybe it's the confusion between the case law and different cases and the instructions, but there is language, at least in the Obsta case, that tracks what opposing counsel is saying, that gross negligence and actual knowledge are essential elements. I'm not sure, how do you square that with then the actual instruction that puts them both together? When we think of elements, we think of one, two, three, four, and that they would be separate. Correct, Your Honor, but when you look at gross negligence and the manner in which it's given in voluntary manslaughter, it actually requires two elements itself. You've got sub-elements to gross negligence. First element is the wanton and reckless behavior, which I think you have, I think I've listed 13 things or more which a jury could have looked at as far as his behavior amounting to the wanton and reckless behavior. Schmidt goes on then in Obsta as well to indicate that, well, then you have element number two of gross negligence, which is knowledge, actual knowledge, or an individual knew from the circumstances that the behavior could reasonably and foreseeably put someone in peril. So you have the instructions giving that, and you have the jury looking at what they need to find. Here, they have to find actual knowledge of the wanton and reckless behavior, or that he reasonably and foreseeably should have known. Now, he indicated to the agent in his interview, why would I drive when I'm drunk? I know that's not right. Something to that effect. He knew that driving while intoxicated was wrong, and that he shouldn't do that because it could imperil some other individual. In this particular case, it did. He ran over his nephew. Once he got into the vehicle, started it up and backed up. So there is the elements, the proper elements are given to the jury in the instructions. The jury had everything they needed to. The instructions were proper. There was no objection to them in this particular case. These instructions were provided by the district court. I believe almost since the particular judge in this matter has come into the district, these particular instructions were provided in these types of cases. We've had these cases previously. And again, what basically the defense is trying to do in this particular matter, what Mr. Bowman is asking the court is, go back and review the case to a certain extent and read out everything after the or. How was the case argued in closing? Was that distinction in the definition of gross negligence where it includes the knowing conduct, knowing that your conduct would be a threat or having knowledge that it would be foreseeable, how was that argued by the defense and the prosecutor or was it focused on? I know it was focused on by our prosecutor, Your Honor. I know she referenced gross negligence at least once during the actual closing arguments and then again in the rebuttal arguments in trying to refocus the jury on what the elements were that they needed to find. In doing so, I believe she went through and she listed out the actual conduct similar to the way I did for you guys today in outlining all of the things that Mr. Bowman would have done prior to even the moment which he got into the vehicle, started the vehicle and backed over his nephew. So the distinction between the gross negligence and the actual knowledge, was that focused on as far as you know in the closing by either party? I don't think it was focused on specifically like that. I believe it was provided to them in that referencing the instructions that the court gave the jury. And the instructions again outline, you either have to find this with this or this. And the jury made a determination that Mr. Bowman's conduct was the conduct of such that would result in a conviction in this particular matter. I believe the court in this particular case did not err at all, I would say, let alone plainly err. The instructions were correct and proper. As to the sufficiency of the evidence, again, I don't want to go back and belabor the... Well, why don't you summarize then. Suppose you had just a drunk person, all you had was a drunk driver who backed over a person. Would that be enough or would you need more? Resulting in the death of that individual, Your Honor? Your Honor, I think it could be. It could be. It could be. It could be enough to... If the person... I mean, I guess you'd have to look at what kind of knowledge a person had prior to getting into the vehicle. In this case, Mr. Bowman knew he was drunk and too drunk to drive. He got in. But again, one person could infer, you could argue an inference to the jury that anybody who drinks to intoxication should know that their intoxication should prevent them from driving a vehicle because they couldn't do so safely. Yeah. Well, the defense, of course, is arguing that if we accept that position, we're collapsing involuntary manslaughter with a strict liability DUI causing death statute. What do you think of that? I don't believe they're correct, Your Honor. I think... What would be the distinction between... The distinction is the DUI is nothing more than the... In relation to the second element of the crime, which is the unlawful act not amounting to a felony, i.e. DUI. And that's why the court kept that under element number two. Then you go on to that second, or that third element, which you get to gross negligence, which now incorporates... Well, I understand the difference in the elements, but I think his point is that if we say that all you need is a drunk driver and a death, we're essentially reading out the third element. I don't think you can get there, Your Honor, because you still have to have that gross negligence. And the gross negligence requires the wanton or reckless behavior, which DUI, jumping in a vehicle, could be considered that, but you still have to have that knowledge. All right. If you had to summarize what we have here beyond the, what you might say, the bare case of a drunk driver and a death, what would you say? I would say we have to have a little beyond. What would you say here that we have beyond your brief summary of... All of that conduct leading up to it, Your Honor. Thirty days straight of drinking, drinking earlier in the day, knew he couldn't drink or couldn't drive, had to have somebody else drive him. All of that conduct boils over to a point where the jury looked at it and said, all of that leads to wanton and reckless behavior because he knew he could not safely drive a vehicle prior to getting into that. Once he gets in and turns the key and starts the vehicle and puts it in gear, that's the DUI at that point. Everything else is all of the wanton and reckless behavior that leads up to him making that car and turn the key. He gets in, he decides to anyway, and he turns the key, doesn't look around, doesn't look in the rearview mirrors, no testimony of that, disregards the safety feature of the vehicle, puts it in the gear and backs up. You testified that he didn't look in the mirrors? I'm just saying, I added that, Your Honor, and that's not a fact. I'm sorry. That shouldn't... But there was no indication that he looked in the mirrors or looked clear around the vehicle, so one could assume and infer that he failed to look around the vehicle, which one person would do if you got into your vehicle, you tend to look around your vehicle. In this particular case, he got in the vehicle, disregarded everything, and backed over his nephew. So the gross negligence requires still that wanton and reckless behavior, Your Honor, and the knowledge or the reasonable foreseeability that you can put somebody in peril. As for the, again, for the sufficiency of the evidence, well, again, that's a pretty tough hill to climb. Here you have a lot of evidence that was presented to the jury, a lot of testimony about what Mr. Bowman was up to prior to this event occurring, all of the shopping, the travel to Bismarck, the failure to use backup cameras, all of that coming together, there was sufficient evidence in this particular matter. I'd ask the court to affirm the conviction in this particular matter and deny the appeal of Mr. Bowman. If there are no further questions? Apparently not. Thank you for your argument. Thank you, Your Honor. He doesn't have rebuttal time, Your Honor. Would you like one minute for rebuttal, or do you think you've said all that needs to be said, Mr. Pennington? I'll take the opportunity for rebuttal, Your Honor. All right. For future reference, you know, the clock shows your entire time. If you want to save some room for rebuttal, you've got to discontinue your argument before the clock expires. Thank you, Your Honor. Maybe this is your first experience with our clock. I want to interrupt your train of thought by saying, what specific instruction should have been given? Have you worded it in your own mind or in your brief? Maybe it's in your brief. I don't have it before me. What instruction should have been given? Your Honor, the instruction that we would have asked for is, one, there had been a specific recitation of the elements, and those elements would have included not only gross negligence, but also the actual knowledge component. And then when we get to the actual definition of those offenses, there would be an independent definition of gross negligence, an independent definition of actual knowledge. In our proposed jury instruction, which was jury instruction four, we had an actual description of gross negligence. We had an independent description of actual knowledge. What we didn't have in our proposed jury instruction was a separation of the elements of gross negligence and actual knowledge. We got one step close, but didn't get far enough. So that's specifically what we would ask for, is that they be enumerated separately and the definitions be separated as well. So the question for us, whether the missing element was subsumed in the instructions that were given? That's correct, Your Honor. And for these reasons, we respectfully request that this court either reverse for a judgment of acquittal or remand for future proceedings. Your Honor, thank you for a little attitude. Very well. You're welcome. Thank you for your argument.